UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GCG ASSOCIATES LP, a Washington limited partnership,

    Plaintiff,

v.

AMERICAN CASUALTY COMPANY OF READING PENNSYLVANIA, a foreign insurer authorized to do business in Washington,

    Defendants.

CASE NO. C07-792BHS

ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: DEFINITION OF "COLLAPSE" AND BURDEN OF PROOF, (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: DEFENDANT'S DUTY TO INVESTIGATE

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment Re: Definition of "Collapse" and Burden of Proof (Dkt. 29), Defendant's Cross Motion for Summary Judgment (Dkt. 36), and Plaintiff's Motion for Partial Summary Judgment Re: Defendant's Duty to Investigate (Dkt. 37). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file herein.

ORDER – 1

# I. FACTUAL AND PROCEDURAL BACKGROUND

On April 24, 2007, Plaintiff GCG Associates LP ("GCG") filed a complaint in Snohomish County Superior Court seeking a judgment declaring that American Casualty Company of Reading Pennsylvania ("American Casualty") is liable to pay for an investigation to determine coverage for a structural impairment caused by hidden decay and alleging breach of contract, bad faith, and violation of Washington's Consumer Protection Act ("CPA"), RCW 19.86 *et seq*. Dkt. 2, Exh. 2 at 11. Unless otherwise indicated, the following facts are undisputed:

GCG owns Chateau Pacific, a retirement and assisted living community located in Lynnwood, Washington. Dkt. 31, Exh. A at 6. Chateau Pacific consists of a 140-unit, four-story, wood-framed building. The facility is comprised of one continuous building consisting of three separate sections designed to independently resist seismic forces. The sections are connected by walkways and are commonly referred to as the North, Central, and South buildings.

From October of 2004 to October of 2006, American Casualty insured GCG under policy number P2 79534060. *See* Dkt. 30, Exh. B. The policy included a section entitled "Commercial Property Coverage Part," which includes the "Health and Personal Care Facilities - Building and Personal Property Coverage Form" and the "Commercial Property Conditions" form. The policy provides coverage as follows:

> We will pay for direct physical loss of or damage to Covered Property caused by or resulting from any Covered Cause of Loss.
> 1. Covered Property
> Covered Property, as used in this Coverage Part, means the following property unless otherwise specified in the Declarations:
> a. Real Property at premises described in the Declarations. Real Property includes:
> (1) Buildings and structures.
> ***
> 3. Covered Causes of Loss
> Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE, unless the loss is excluded or limited in Section B. EXCLUSIONS AND LIMITATIONS.
> ***
> 4. Additional Coverages
> ***

ORDER – 2

f.      Collapse
                        We will pay for loss, damage, or expense under this Coverage Part
        caused by or resulting from risks of direct physical loss involving.
        Collapse of a building or any part of a building caused only by one or more
        of the following:
                                        ***
                (2) Hidden decay.

Dkt. 30, Exh. D at 33-36.

The Commercial Property Conditions form provides as follows:

> H. Policy Period, Coverage Territory
> Under this Coverage Part:
> 1. We cover loss or damage commencing:
> a. During the policy period shown in the Declarations; and
> b. Within and between the coverage territory.

Dkt. 30, Exh. E at 57.

In 2005, GCG retained Swenson Say Fagét ("Swenson"), a structural engineering firm, to assess whether water intrusion had damaged Chateau Pacific. *See* Dkt. 31 at 2. Swenson identified areas of substantial structural impairment and recommended a more extensive investigation to determine the extent of the damage.

On February 6, 2006, GCG filed a claim for damage to Chateau Pacific under the American Casualty policy. Dkt. 30, Exh. A at 4. American Casualty responded by letter on February 15, 2006. Dkt. 40 at 3; Dkt. 40-3, Exh. 4 at 6. American Casualty reserved its rights under the policy and stated that it was unable to take a position regarding coverage until further testing. Dkt. 40-3, Exh. 4 at 6. GCG advised that it would open Chateau Pacific to experts during the weeks of March 13, 2006, and March 20, 2006. Dkt. 40 at 3. On February 27, 2006, American Casualty provided GCG with a discussion of the claim, contact information for CASE Forensics, American Casualty's engineering consultant, and Young & Associates, which provided American Casualty with a cost estimate. Dkt. 40 at 3. American Casualty declined to fund GCG's consultants and requested specific documents as part of its claim investigation process. *Id.*

GCG's additional investigation began in March of 2006. As part of the investigation, GCG cut holes in Chateau Pacific's siding to allow Swenson engineers to

ORDER – 3

observe the framing and sheathing underneath. CASE Forensics investigators and engineers conducted on-site field examinations on March 13-15, 18, 24, and 28, and April 3, 10-11, and 17. Dkt. 40-3, Exh. 8 at 25.

Sheathing fastened to the building's framing was responsible for creating rigidity and protecting against lateral forces such as wind and seismic activity. Swenson determined that the sheathing had been severely decayed and that Chateau Pacific's lateral load-resisting capacity had been substantially structurally damaged. Dkt. 31 at 4-5; Dkt. 31, Exh. A at 62. Swenson concluded that the deterioration did not reach a state of substantial structural impairment before October of 2004. Dkt. 31, Exh. A at 68. Swenson recommends replacement of the exterior sheathing. Dkt. 31 at 5.

CASE Forensics issued a preliminary report in June of 2006. CASE Forensics concluded that certain construction deficiencies caused water intrusion and wood decay and recommended additional openings to examine the condition of certain sheathing and framing walls. Dkt. 40 at 5. American Casualty notified GCG that its consultants sought to make additional openings in Chateau Pacific's cladding in order to conclude their investigation. Dkt. 40 at 4; Dkt. 40-3, Exh. 7 at 15 ("[American Casualty's] consultants require additional openings in the exterior cladding of the subject building in order to conclude their investigation into this claim. . . . Of course, [American Casualty] will be responsible for all costs incurred in opening these additional areas and in closing the temporary openings."); *see also* Dkt. 41-2, Exh. 2 at 4 (July 12, 2006, letter containing similar request).

In response to American Casualty's request to make more openings as part of its investigation, GCG expressed its hope that American Casualty would reduce or eliminate the amount of additional destructive investigation in light of the Swenson Say report and the impact of another investigation on Chateau Pacific residents. Dkt. 41-2, Exh. 3 at 6. GCG also specifically inquired whether the additional investigation was to determine the extent of coverage, whether American Casualty had determined that the damage was not

covered, and whether American Casualty would cover business losses caused by the additional investigation. *Id.*

In response to GCG's concerns, American Casualty declined to make a partial determination regarding coverage and stated its belief that the additional investigation would not be as destructive as the initial investigation. Dkt. 41-2, Exh. 4 at 8-9. GCG "reluctantly agree[d]" to permit American Casualty to perform additional destructive investigation but asked American Casualty to limit its investigation to two of the four proposed areas. Dkt. 48-3, Exh. 7 at 16. American Casualty then proposed to limit its additional investigation to drilling small holes. Dkt. 41-2, Exh. 5 at 10. GCG permitted this additional testing on September 11 and September 12 of 2006. Dkt. 40 at 5.

On December 11, 2006, American Casualty sent GCG a letter stating American Casualty's position with respect to coverage; American Casualty confirmed that the repair suggested by the November CASE Forensics report was within the scope of collapse coverage and included Young & Associates' estimate of the cost of repairs. *Id.* American Casualty's total payment to GCG was $124,066. *Id.*

GCG now moves for partial summary judgment, seeking a ruling that "(1) 'collapse' in the CNA Policies is interpreted to mean 'substantial impairment of structural integrity'; and (2) Defendant bears the burden of proving what amount of 'collapse' damage commenced outside the CNA policy periods." Dkt. 29-2 at 2.

In its response, American Casualty includes a cross-motion seeking summary judgment as to all claims. Dkt. 36. American Casualty contends that summary judgment is proper because there is no evidence of additional areas in a state of substantial impairment of structural integrity, because a reasonable investigation does not require stripping and recladding, and because American Casualty's conduct was reasonable. Dkt. 36 at 16-21.

## II. DISCUSSION

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

## A. DEFINITION OF COLLAPSE

Interpretation of insurance policies is a question of law, and courts construe insurance policies as a whole, giving force and effect to each clause in the policy. *American Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874 (1993), *opinion supplemented by* 123 Wn.2d 131 (1994). Insurance policies are given a fair, reasonable, and sensible construction consistent with the understanding of an average person purchasing insurance. *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 575 (1998).

If the policy language is clear and unambiguous, the court will not modify the policy or create an ambiguity. *American Star*, 121 Wn.2d at 874. If the policy language is fairly susceptible to two different reasonable interpretations, it is ambiguous, and the court may attempt to discern the parties' intent by examining extrinsic evidence. *Id.* If the policy remains ambiguous after resort to extrinsic evidence, the court construes the ambiguities against the insurer. *Id.* at 874-75.

GCG first asks the Court to rule that the definition of "collapse" is "substantial impairment of structural integrity." Dkt. 29 at 9-11. American Casualty contends that there is no dispute as to the definition of "collapse" and that partial summary judgment should therefore be denied for lack of an actual controversy. Dkt. 36 at 13. As to the definition of "collapse," Plaintiff's Motion for Partial Summary Judgment (Dkt. 29) is granted.

## B. BURDEN OF PROOF

In Washington, the determination of insurance coverage is a two-step process. *Diamaco, Inc. v. Aetna Cas. & Sur.*, 97 Wn. App. 335, 337 (1999). The party seeking to establish coverage bears the initial burden to prove that coverage under the policy has been triggered. *Id.* If coverage is triggered, the insurer then bears the burden to prove that the loss is specifically excluded by the policy language. *Id.* If coverage is not triggered, the court does not proceed to address any exclusions from coverage. *Western Nat'l Assur. v. Hecker*, 43 Wn. App. 816, 823 n.2 (1986).

GCG next asks the Court to rule as a matter of law that American Casualty bears the burden of proving what amount of collapse damage, if any, occurred outside of the policy periods. Dkt. 29 at 13. GCG contends that this assignment of the burden of proof is appropriate because the temporal limitations in the American Casualty policies are not part of the insuring clause. The cases GCG cites as support do not lead to this conclusion.

In *Diamaco*, the Washington State Court of Appeals confronted an insurance policy with "broad property damage coverage which relie[d] on specific exclusions to limit coverage to the property of another." *Diamaco*, 97 Wn. App. at 341. The court there declined to infer that the coverage of the policy was limited to damage to property of another where the insuring clause defined property damage merely as injury to tangible property or loss of use of tangible property that is not injured. *Id.* at 338. Therefore, the insurer was permitted to avoid coverage only by invoking a specific exclusion. *Id.* at 341-42. Similarly, the court in *Overton* declined to factor an owned-property exclusion into the initial determination of whether coverage existed. *See Overton v. Consolidated Ins. Co.*, 145 Wn.2d 417, 432 (2002).

In this case, whether the loss or damage commenced during the policy period is not the subject of an exclusion. *Compare* Dkt. 30, Exh. D at 42 ("EXCLUSIONS AND LIMITATIONS) *with* Dkt. 30, Exh. E at 7. By asking the Court to require American Casualty to bear the burden of proof as to whether the claimed loss or damage commenced during the policy period, GCG effectively asks the Court to construe this policy provision as an exclusion. The policy contains a section devoted to exclusions and limitations; the provision regarding commencement of loss or damage during the policy period is not identified as an exclusion and is found in a separate portion of the policy altogether. GCG offers no authority for construing a portion of the policy outside of the exclusion section to constitute an exclusion. The Court is instead persuaded by the approach in *Federal Deposit Ins. Corp.*, a case decided under California law. *Federal Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478 (9th Cir. 1991). There, the

ORDER – 8

Ninth Circuit declined to construe a limitation as an exclusion because such an "interpretation of the agreement ignore[d] the fact that the bond contain[ed] a section that clearly label[ed] the conduct that [wa]s excluded from the policy under the heading 'Exclusions.'" *Id.* at 483. Here too, the Court declines to construe the commencement requirement as an exclusion because the policy does not identify it as such. In this respect, Plaintiff's Motion for Partial Summary Judgment (Dkt. 29) is denied.

## C.  AREAS IN A STATE OF SUBSTANTIAL IMPAIRMENT OF STRUCTURAL INTEGRITY

The parties agree that the relevant standard in assessing the damage at Chateau Pacific is "substantial impairment of structural integrity." The parties disagree as to whether there is evidence sufficient to meet that standard and whether the proffered witnesses in this matter have properly employed that standard. *See, e.g.*, Dkt. 45 at 3 ("Richard Dethlefs [American Casualty's proffered expert] repeatedly refers in his report to 'imminent collapse.' This is a more stringent standard than 'substantial impairment of structural integrity.'"); Dkt. 36 at 16 ("The standard for 'collapse' adopted by the majority of courts is substantial impairment of structural integrity. The standard that GCG attempts to apply through the declarations and report of its expert, Stephen Ting, is different."). American Casualty seeks summary judgment as to whether Chateau Pacific is in a state of substantial impairment of structural integrity because, according to American Casualty, Mr. Ting employed an incorrect standard in his expert report and because American Casualty's proffered expert concludes that Chateau Pacific is not in a state of substantial impairment of structural integrity. *Id.* at 18.

In the course of two pages of briefing, American Casualty seeks summary judgment dismissal of GCG's breach of contract claim and request for declaratory judgment on the grounds that GCG's expert, Mr. Ting, employed the wrong standard in concluding that Chateau Pacific is in a state of collapse. *Id.* at 16-18. American Casualty essentially contends that Mr. Ting's declaration conflicts with his report and therefore

1 fails to create a genuine issue of material fact as to whether Chateau Pacific is in a state of collapse.

The parties are in agreement as to the standard governing the level of damage required to constitute "collapse" and trigger coverage under the American Casualty policy. To the extent that Mr. Ting's declaration can be read to conflict with his report, such a conflict depends, in part, on issues of credibility and cannot be resolved at the summary judgment stage. In this respect, American Casualty's motion is denied.

**D.     DUTY TO INVESTIGATE**

American Casualty seeks summary judgment dismissing GCG's bad faith and CPA claims on two grounds. Dkt. 36 at 18-21. First, American Casualty contends that *Lakehurst Condominium Owners Ass'n v. State Farm Fire and Cas. Co.*, 486 F. Supp. 2d 1205 (W.D. Wash. 2007), establishes as a matter of law that requiring an insurer to remove all siding from an entire building to investigate decay is unreasonable. Dkt. 36 at 18-20. Second, American Casualty contends that GCG objected to American Casualty's proposal to make additional openings to investigate the decay and that GCG's claim that American Casualty's investigation was not extensive enough is therefore disingenuous. *Id.* at 20.

GCG also moves for partial summary judgment regarding American Casualty's duty to investigate. Dkt. 37. GCG contends that American Casualty is responsible for removing the siding at Chateau Pacific and investigating the extent of the covered damage resulting from "collapse" and that American Casualty's investigation was unreasonable as a matter of law because American Casualty's expert admits that there may be substantial impairment of structural integrity in the portions of Chateau Pacific that have not been opened. *Id.* at 13.

    **1.     The Consumer Protection Act**

The CPA creates a private cause of action: "Any person who is injured in his or her business or property by a violation of RCW 19.86.020 ["unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce"] . . . may bring a civil action." RCW 19.86.090. The elements of a private CPA violation are (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) that impacts the public interest; (4) and causes injury to the plaintiff in his or her business or property; and (5) such injury is causally linked to the unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986).

Regarding the second element, trade or commerce "includes the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2). The first two elements of a CPA violation may be proved through direct evidence or may be established by a showing that the alleged act constitutes a per se unfair trade practice. A per se unfair trade practice exists when, by statute, the Legislature declares an unfair or deceptive act in trade or commerce and the statute has been violated. *Id.* at 786. Of course, not every statutory violation falls within the CPA. *State v. Schwab*, 103 Wn.2d 542, 549 (1985).

The third element, public interest, depends upon the nature of the dispute. In a private dispute, the public interest prong depends upon "the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion." *Hangman Ridge*, 105 Wn.2d at 790. In a consumer transaction, the court must examine several factors to determine whether the public interest is impacted:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Id.* Where the transaction was essentially a private dispute, as between an insurer and an insured, the following factors may indicate the requisite public interest: "(1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise

to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?" *Id.* at 790-91.

### 2. **Insurance Bad Faith**

The fiduciary relationship between insurers and policyholders gives rise to a duty of good faith; in Washington, the duty is imposed legislatively and judicially. *American Manufacturers Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 696-97 (2001). The Insurance Commissioner has promulgated regulations defining specific acts and practices that constitute a breach of the duty of good faith. RCW 48.30.010; *see* WAC 284-30-300 to -800. An action for breach of the duty of good faith sounds in tort and may be brought under the CPA. *American Manufacturers Mut. Ins. Co.*, 104 Wn. App. at 696-97; RCW 19.86.170 ("actions and transactions prohibited or regulated under the laws administered by the insurance commissioner shall be subject to the provisions of RCW 19.86.020").

The elements for a claim of bad faith are similar to those for a claim of bad faith under the CPA except that, with respect to a bad faith claim not under the CPA, "the injury alleged need not be economic and may include emotional distress or personal injury." *American Manufacturers Mut. Ins. Co.*, 104 Wn. App. at 697-98. An insurance company may be liable for bad faith even if the policyholder's loss is ultimately not covered. *Coventry Associates v. American States Ins. Co.*, 136 Wn.2d 269, 279 (1998). A policyholder asserting bad faith bears a heavy burden, and such a claim is not easy to establish. *Overton v. Consolidated Ins. Co.*, 145 Wn.2d 417, 433 (2002). The policyholder must show that the insurer's breach of the insurance contract was "unreasonable, frivolous, or unfounded," and an action for bad faith will not lie if the insurer's interpretation was reasonable. *Id.* An insurer acts in bad faith when it denies coverage based upon mere suspicion and conjecture, fails to conduct a good faith investigation of the facts before denying coverage, or denies coverage based on a

1 supposed defense that a reasonable investigation would have proved to be meritless. *Industrial Indem. Co. of the Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 917 (1990).

The policyholder bears the burden of proving that the insurer acted in bad faith, and the insurer is entitled to summary judgment if reasonable minds could not differ that the denial of coverage was based upon reasonable grounds. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 486 (2003). The mere existence of a "theoretical," reasonable basis for the insurer's conduct is not dispositive, and the policyholder may present evidence that professed basis for the conduct was not the actual basis or that other factors outweighed the reasonable basis alleged. *Id.*

**3.     Discussion**

In this case, GCG contends that American Casualty failed to conduct a reasonable investigation before denying its claim for damage to Chateau Pacific. *See* WAC 284-30-330(4) ("The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance . . . : (4) Refusing to pay claims without conducting a reasonable investigation."); *Kallevig*, 114 Wn.2d at 923 ("A violation of WAC 284-30-330 constitutes a violation of RCW 48.30.010(1), which in turn constitutes a per se unfair trade practice . . . [that] may result in CPA liability if the remaining elements of the 5-part test for a CPA action under RCW 19.86.090 are established."). Both parties seek summary judgment as to whether American Casualty's investigation was reasonable. American Casualty contends that standards set forth in *Lakehurst* establish that its investigation was reasonable as a matter of law. Dkt. 36 at 18-20. GCG relies on *Misawa on the Green II, L.P v. The Travelers Indemnity Company*, No. C00-2054JCC (W.D. Wash. May 30, 2002), for its contention that American Casualty is required, as a matter of law, to conduct a more thorough investigation. Dkt. 37 at 12.

*Lakehurst's* factual background is similar to the instant case. Lakehurst arranged for an engineering firm to inspect its condominium building for water intrusion damage. Lakehurst's engineering firm noted construction defects and decay but did not note

ORDER – 13

evidence of collapse. *Lakehurst*, 486 F. Supp. 2d at 1208. Lakehurst notified its insurance carriers, Trinity Universal Insurance Company ("Trinity") and American Alliance Insurance Company ("American") of the water intrusion damage, and the insurance companies conducted their own investigations to determine whether the damage was covered by their policies. During the insurance company investigations, Lakehurst filed suit against the companies. Lakehurst alleged, in part, that the insurance companies' investigations were inadequate and that the inadequate investigations violated the CPA and constituted bad faith.

American conducted two inspections. After the first inspection, American's expert noted damage and decay and proposed a second inspection. *Id.* at 1209. During the second inspection, American's expert "made various exploratory openings." *Id.* In summarizing American's investigation, the *Lakehurst* court noted that American's expert received no objections or requests that he change the scope of his investigation. *Id.* at 1210. Trinity's experts did not make any openings and instead inspected openings made during previous investigations. *See id.* at 1211.

The *Lakehurst* court granted summary judgment for the insurance companies, concluding that "[t]here [wa]s no question that the investigations performed by American and Trinity were both reasonable." *Id.* at 1214. The court noted that the insurance companies hired qualified experts whose investigations were extensive, prompt, and thorough. *Id.* The *Lakehurst* court held that "[t]o meet the standard for a 'reasonable investigation,' the insurers are not required to tear all the siding off the entire occupied building and inspect every single piece of wood that might be subject to decay" even though such a highly intrusive investigation might provide more information to insurers. *Id.* at 1214-1215.

GCG urges the Court to adopt the approach taken in *Misawa*. Misawa on the Green II, L.P. ("Misawa") filed a claim arising from damage to one of its apartment buildings. *Misawa*, No. C00-2054JCC, slip op. at 2. The Travelers Indemnity Company

of American ("Travelers") hired an architect to perform a visual inspection of all buildings. *Id.* The architect identified substantial structural defects in at least nine of the buildings and recommended a more thorough inspection. *Id.* at 2, 5. Travelers did not conduct the additional investigation and instead concluded that the collapse had not manifested itself during the Travelers policy periods. *Id.* at 5. The *Misawa* court held that Misawa had met its initial burden of producing evidence that a covered loss occurred during the policy period and that such production "triggered Travelers' contractual and regulatory duty to provide a prompt and comprehensive investigation regarding the possibility of coverage." *Id.* at 5. Travelers was therefore ordered to conduct a comprehensive investigation of potential collapse and to remove, and eventually replace, all finishes in particular buildings. *Id.*

While *Lakehurst* and *Misawa* are both illustrative of the Court's inquiry in determining whether American Casualty's investigation was reasonable, the question of reasonableness is highly dependent upon the context of each individual case and does not lend itself to a mechanical application of cases with analogous, or distinguishable, facts. *See Kallevig*, 114 Wn.2d at 920. In determining whether American Casualty's investigation was reasonable, the Court is mindful of the extent of American Casualty's investigation, which included resistance drilling and examination of openings made by GCG's expert; American Casualty's methodology in determining the extent of collapse while not conducting further openings; and American Casualty's desire to make additional openings to facilitate further investigation and GCG's reluctance to permit further destructive investigation.

As with the insurance companies in *Lakehurst*, American Casualty's investigation primarily relied on openings made during GCG's own investigation. American Casualty's investigators also conducted resistance drilling and laboratory examination of stucco evidence. Dkt 40-3, Exh. 8 at 25; Dkt. 41-2, Exh. 6 at 15. *Lakehurst* is instructive insofar as the case demonstrates that in assessing the reasonableness of an insurance company's

investigation, the reviewing court should view the insurance company's investigation in context and not in isolation. The investigations in *Lakehurst*, viewed in isolation, might suggest that the insurance company's experts were relatively passive. The *Lakehurst* court looked beyond the active investigatory work undertaken by the *Lakehurst* insurance companies, however, and considered the extent to which the insurance companies' investigations built upon the investigation undertaken by the insured. In *Lakehurst*, as in this case, the insurance companies utilized the investigation undertaken by the insured. American Casualty therefore did not act unreasonably merely by utilizing openings already made by GCG's investigators. It would not be reasonable to require American Casualty to make its own openings in Chateau Pacific unless openings already made were insufficient to allow American Casualty to conduct a reasonable investigation.

While GCG now contends that a reasonable investigation requires that American Casualty make additional openings in Chateau Pacific, GCG fails to demonstrate that a reasonable investigation could not rely solely on openings made by GCG's consultants. Ahmed M. Jaddi, of CASE Forensics, concluded that "much less" than 10% of Chateau Pacific was opened up in March and April of 2006. Dkt. 38, Exh. A at 12. Mr. Jaddi suggests that the openings made at Chateau Pacific were sufficient to create a sample from which the true extent of the damage could be extrapolated. *See id.* at 15 ("you take sampling, and based on the sampling, you do a statistical analysis and extrapolate results"). GCG fails to dispute the efficacy of this methodology or to offer evidence suggesting that the openings made at Chateau Pacific were unrepresentative or otherwise insufficient.

This case is also similar to *Misawa* in that American Casualty's engineering consultant, CASE Forensics, recommended additional openings and additional investigation. Dkt. 41-2, Exh. 1 at 1 (June 6, 2006, letter, seeking to make additional openings in order to conclude investigation); *see also* Dkt. 41-2, Exh. 2 at 4 (July 12,

2006, letter containing similar request). However, in this case, GCG was reluctant to permit American Casualty to conduct the proposed additional investigation.

In response to American Casualty's request to make more openings as part of its investigation, GCG expressed its hope that American Casualty would reduce or eliminate the amount of additional destructive investigation in light of the Swenson Say report and the impact of another investigation on Chateau Pacific residents. Dkt. 41-2, Exh. 3 at 6. GCG also specifically inquired whether the additional investigation was to determine the extent of coverage, whether American Casualty had determined that the damage was not covered, and whether American Casualty would cover business losses caused by the additional investigation. *Id.* In response, American Casualty declined to make a partial determination regarding coverage and stated its belief that the additional investigation would not be as destructive as the initial investigation. Dkt. 41-2, Exh. 4 at 8-9. American Casualty then proposed to limit its additional investigation to resistance drilling, which consists of drilling small holes. Dkt. 41-2, Exh. 5 at 10. While GCG contends that this type of testing was insufficient, GCG's contentions are conclusory in this regard, and GCG fails to create a genuine issue of material fact as to whether resistance drilling constitutes an unreasonable method of investigating collapse.

In light of the facts and circumstances of this case, the Court concludes that reasonable minds could reach only one conclusion: American Casualty's investigation of Chateau Pacific was reasonable. American Casualty inspected openings made during GCG's investigation. American Casualty sought to make additional openings but encountered reluctance from GCG and Chateau Pacific. American Casualty therefore undertook resistance drilling, relying on sampling and extrapolation to determine the extent of the damage. A more probing investigation may have uncovered more information. American Casualty is not required to undertake the most extensive investigation possible, however. Rather, American Casualty is required to investigate claims in a reasonable manner before determining coverage. By focusing on what more

American Casualty *could have done* to investigate Chateau Pacific's damage rather than the sufficiency of the investigation that *actually occurred*, GCG fails to create a genuine issue of material fact as to whether American Casualty's investigation was reasonable. The Court therefore concludes that American Casualty is entitled to summary judgment as to its duty to investigate.

### III. ORDER

Therefore, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment Re: Definition of "Collapse" and Burden of Proof (Dkt. 29) is **GRANTED in part** and **DENIED in part** as provided herein; Defendant's Cross Motion for Summary Judgment (Dkt. 36) is **GRANTED** as to American Casualty's duty to investigate and otherwise **DENIED**; and Plaintiff's Motion for Partial Summary Judgment Re: Defendant's Duty to Investigate (Dkt. 37) is **DENIED**.

DATED this 8th day of August, 2008.

BENJAMIN H. SETTLE
United States District Judge